

*Billy & Associates, LLC*
*Innovations in Criminal Justice*

**RE: Brad E. Proctor v. Roane County Commission d/b/a Roane County Sheriff's Department, M.P. King, N.S. Stepp, S.A. McDonald, Z.W. Hartley**

*Civil Action Docket No.: 2:19-cv-00432*

A Preliminary Report by Gerry D. Billy, MCJ

September 14, 2020

### INTRODUCTION:

I have been asked by the law firm of Plants Law Offices of South Charleston, West Virginia to examine reports, testimony and other relevant materials in the review of the case of ***Brad E. Proctor v. Roane County Commission d/b/a Roane County Sheriff's Department, M.P. King, N.S. Stepp, S.A. McDonald, Z.W. Hartley; Civil Action Docket No.: 2:19-cv-00432***. This civil action was filed in the United States District Court for the Southern District of West Virginia.

Specifically, I have been asked by Attorney Mark S. Plants to render my professional opinion as to the on-site performances, actions and responses of the named law enforcement officials during the vehicle pursuit of Brad Proctor on January 10, 2018 and his subsequent arrest at his home in Clay County, West Virginia eight days later.

This report is intended to be preliminary in nature as I await further personnel files, official reports and documents as well as transcripts from past and future sworn testimony. The preliminary opinions that I provide is this matter are based on nearly four decades of full-time professional experience in law enforcement and corrections, through my formal education and specialized training and as a nationally recognized consultant and trainer.

### PROFESSIONAL QUALIFICATIONS:

From a time very early in my professional career while working full-time, I also pursued my formal education as a full-time evening student. I completed my Associate of Applied Science Degree in Police Science from Muskingum Area Technical College in 1975, my undergraduate degree in Criminal Justice from Ohio Dominican College in 1980 and commuted two times each year to the University of Alabama where I was enrolled in a consolidated graduate program for criminal justice practioners. In 1990 I received my master's degree in criminal justice. I graduated with honors at each academic institution.

My military service in the U.S. Army was as a Military Police Investigator (95B2V5) assigned at Presidio of San Francisco and later as an undercover narcotics officer investigating military personnel on U.S. installations in Europe. I was honorably discharged in 1973. Shortly after discharge, I was hired at the Muskingum County Sheriff's Office in Zanesville, Ohio where I was initially assigned as a patrol deputy for a period of three months and then promoted to detective.

While serving as a detective, I investigated a full range of criminal violations from murder to minor infractions, conducted internal investigations, and served as a trainer for both pre-service and in-service personnel. My certificate to instruct law enforcement personnel was issued by the Ohio Peace Officer Training Council (OPOTA - #1195) in June of 1974 and remains to be one a few permanent certificates recognized by the state that remains operational to this day.

In 1976 I was hired as the Agent-in-Charge (AIC) of the Tri-County Anti-Crime Unit based in Newark, Ohio. The Tri-County unit was formed as a multi-jurisdictional organized crime unit with concurrent jurisdiction in three contiguous central Ohio counties; Licking, Perry, and Muskingum. Developed under a grant from the Department of Justice (LEAA), the emphasis for the unit was to investigate organized crime and complex felony cases that

were beyond the investigative capabilities of local law enforcement agencies. In 1977 the Tri-County unit was selected as an Exemplary Project by the DOJ for our accomplishments. As the AIC I was responsible for directing daily operations, supervision of personnel, maintaining an active case file, and coordinating activities with local law enforcement and media.

In July, 1978 I took a position with the law firm of Porter, Wright, Morris, and Arthur in Columbus, Ohio as an investigator assigned to both the labor and litigation departments. The Porter, Wright firm is a very large law firm with offices in several metropolitan cities including Chicago, Naples, Florida, and Washington, D.C. As an investigator I primarily assisted corporate clients during periods of labor disputes, strikes, and arbitrations. I also served subpoenas for various courts and assisted corporate clients in the investigation of employee theft, misconduct and worker's compensation claims. During my two year employment with the law firm, I was approached by deputies of the Licking County Sheriff's Office and asked to run for the office of Sheriff.

In 1981 I was sworn in as Ohio's youngest Sheriff at the age of 29. I completed six full terms (24 years) as the Sheriff of Licking County, retiring in January of 2005. During my tenure, our agency grew from a small rural department with 30 total employees to over 200 sworn and civilian staff and a budget in excess of $14 million when I retired. We are credited with the design and construction of the forth direct supervision style jail facility in the United States (there are currently over 380) and became the first agency in Ohio and one of only fourteen agencies in the nation to achieve the coveted Triple Crown of Accreditation for simultaneous accreditation through the Commission on Accreditation for Law Enforcement Agencies, the American Correctional Association's Commission on Accreditation for Corrections, and the National Commission on Correctional Health Care.

Following my retirement in 2005 as the Sheriff of Licking County, I accepted a position as the Program Director of Criminal Justice at Central Ohio Technical College, a position I maintained until my resignation in April, 2008. As Program Director I was charged with the overall development of a new law enforcement, correctional, and criminal justice curriculum including the development and introduction of 17 new courses, realignment of each of the three plans of study, implementation of articulation agreements with other institutions of higher learning, monitor student practicum's with law enforcement and corrections agencies in five counties and supervised the full-time and adjunct staff. I also continue to serve as an Adjunct Instructor at both Central Ohio Technical College, Columbus State College and OPOTA Basic Police Academy Commander and instructor for two separate police academies.

During my career in public service I have attended hundreds of courses and seminars exploring a wide range of subjects. I am a graduate of the Drug Enforcement Administration's Academy, the National Intelligence Academy, National Sheriff's Academy, and the National Institute of Corrections Academy. I am a frequent speaker at state and national conferences on correctional and law enforcement issues; I have trained tens of thousands of professional corrections and law enforcement personnel throughout the United States, Canada, and was selected to serve as an American Delegate to Her Majesty's Prison Service in Manchester, England. I have provided technical assistance and consulting services to agencies across America in policy and procedures development, pre-architectural and functional programming, operational assessments, defense and plaintiff litigation expert opinions, staffing analysis, security performance evaluations and other selected assignments.

I have authored a number of articles in national law enforcement and corrections trade publications and I am the co-author of Ohio's Basic Corrections Officer Training Curriculum. I serve as a consultant to the U.S. Department of Justice, National Institute of Corrections, the Bureau of Indian Affairs, and the American Jail Association.

**CASE SUMMARY OF FACTS:**

This is a case of conflicting stories as is often found in civil disputes offering "he said – she said" interpretations of a singular event. This case however; is much different. This case offers the sworn testimony and other official reports of seasoned law enforcement officers from both the West Virginia State Police (WVSP) and the Roane County Sheriff's Office about an arrest versus that of one individual's account of what he said happened during the arrest. The real difference here is that Mr. Proctor's version of the arrest event is buttressed by his emergency room medical records. These records paint an entirely different account about the excessive use of force used against Mr. Proctor during his arrest on January 18, 2018.

The evening hours of Wednesday, January 10, 2018 Deputy Michael King of the Roane County Sheriff's Office observed a dark colored Dodge Ram pickup truck operating on Amma Road in Roane County without headlights turned on. Deputy King turned on the vehicle and pursued the truck with emergency lights engaged. At this point the driver of the Dodge Ram accelerates west on Amma Road with Deputy King in pursuit, driving an unmarked county Ford Explorer. Near the bridge at the intersection of Big Pidgeon and Little Pidgeon Roads, the driver of the Dodge Ram ". . . slams on his brake in that vicinity around the bridge. I rear-end him then."[1] (There is no further mention in the documents available that indicate an earlier collision between the two vehicles.)

Interestingly, as this pursuit initiated, Deputy King must have felt relieved in knowing that in addition to himself, Senior Trooper Zachary Hartley of the WVSP was riding along with Trooper 1st Class N.S. Stepp and that Deputy B. Hickman were all on routine patrol in the immediate area of Amma Road.[2] The call went out from Deputy King and everyone joined in the chase.

According to the testimony of Deputy King, he was able to partially get around the speeding pickup when the driver swerved and crashed into the front of King's unmarked vehicle. "He takes the front of my cruiser pins me against a hill and drags me up a ditch line, and I can't get away from him."[3]

As King is being dragged along the ditch line he unholsters his weapon and points it toward his passenger window at the driver of the Dodge Ram. Deputy King notices that there was a passenger in the truck and decides not to take the shot.[4]

---

[1] Deposition of M.P. King, p. 35 (21-22)
[2] Report of Criminal Investigation, Trooper Zachary Hartley, Detachment File # 433012870
[3] Deposition of M.P. King, p. 36 (5-7)
[4] Deposition of M.P. King, p. 38 (3-10)

Billy & Associates, LLC                                                                                                4

EXHIBIT 3

As a result of the extended collision along the ditch line, King's cruiser is rendered inoperable with a flattened right front tire. The pursuit of the fleeing Dodge truck continued unabated by the remaining cruisers but is eventually suspended. The driver of the Dodge Ram had eluded capture. Fortunately, Deputy King had been able to secure the license plate number of the vehicle earlier which proved only the plate (at that time) to be stolen.[5]

The following day Deputy King contacted O'Dell's Exxon, a gas station and market where the dark colored Dodge Ram had been seen by King leaving prior to the pursuit. The officer was able to gather security video and still photographs of the driver of the truck, both exiting the vehicle and while paying in cash for gas inside the market. Although the subject looked unfamiliar to Deputy King, deputies of Clay County confirmed the identity of the mystery driver as Brad Proctor.[6]

On Thursday, January 11, 2018 the 1996 Dodge Ram 2500 pickup was located inside a barn in Clay County, covered in hay. The owner of the barn notified the West Virginia State Police who later confirmed that in addition to the stolen plate, the vehicle had been reported stolen from Braxton County.[7]

Seven days later on January 18, 2018 the modular home of Brad Proctor, located at 4307 Ovapa Road, Clay County, was entered by several law enforcement officers without notice to effect Proctor's arrest on outstanding warrants. This is the point where the events of the actual arrest of Brad Proctor gets a little fuzzy. At least according to the reports available to me at this point.

**Case Discussion:**

There is both a moral and legal imperative that whenever a law enforcement officer arrests an individual, it must be completed in a manner that does not exceed the minimum amount of force necessary to diffuse the situation or to take the individual into custody.

The International Association of Chiefs of Police define the use of force as the *". . . amount of effort required by police to compel compliance by an unwilling subject."*[8] Whereas the National Institute of Justice in a 2020 article on the amount of force used expands the definition by stating, *"Law enforcement officers should use only the amount of force necessary to mitigate an incident, make an arrest, or protect themselves or others from harm. The levels, or continuum, of force include basic verbal and physical restraint, less-lethal force, and lethal force."*[10]

On January 1, 2019 the FBI launched a National Use of Force Data Collection project. On July 1, 2020 the FBI would not release the first year's data voluntarily provided by 5,043 federal, state, local and tribal law enforcement agencies. Regrettably, this figure only represents 40% of the law enforcement officers in the nation and as such, the FBI will not release aggregate use of police force data until 80% of the police population is represented.

---

[5] State SSCH NBR Search, Reported Stolen License Plate Message, July 30, 2017
[6] Roane County Grand Jury Transcript, May 2018 Term; Testimony of M. King, p. 6 (10-20)
[7] Report of Criminal Investigation, Trooper N.S. Stepp, Detachment File # 433012870
[8] International Association of Chiefs of Police, *Police Use of Force in America*, 2001
[9] National Institute of Justice (DOJ) *Overview of Police of Force, (2020)*

Billy & Associates, LLC                                                                 5

EXHIBIT 3

The Amended Complaint filed in this matter is Civil Rights violation complaint under the provisions of Title 42 U.S.C. § 1983. The first count of the Complaint incorporates the allegations as found in paragraphs 1 through 36 of the amended complaint by stating that defendants M.P. King, N.S. Stepp, S.A. McDonald and Z.W. Hartley used excessive force in the arrest of plaintiff Brad E. Proctor. While I concur with the content of the Amended Complaint, I believe there is something more. To say that the action taken by the defendants in the arrest of Mr. Proctor as merely "excessive force" is beyond the pale. This was a calculated hit job by the four police officers, led by none other than Deputy Michael King.

There is term used by both scholars and government officials that extends beyond "excessive force" and it more accurately defines what these officers collectively carried-out January 18, 2018; an act of *police brutality*. Make no mistake, the use of excessive force by an officer to make and arrest is unethical, illegal, and violates the civil rights of those victimized. So there is no confusion, let me explain the difference in terms.

Excessive force is defined as *"the application of an amount and/or frequency of force greater than that required to compel compliance from a willing of unwilling subject."*[10] Force is allowed to a certain extent in every jurisdiction when police are trying to secure an arrest. Excessive force happens when force is justified but an officer uses a greater degree than is necessary.

Whether the use of excessive force is aberrant behavior on the part of the individual officer or is a common practice of an entire agency, both the law and public opinion generally condemn it.[11]

Police brutality on the other hand, is defined as *"the use of excessive and unnecessary force by a police officer toward a civilian or the willful infliction of pain and/or suffering on someone."*[12] Police brutality is more severe and represents gross imbalance between citizen noncompliance and level of police force. "The use of a baton to strike a compliant handcuffed suspect, for example, is an example of police brutality."[13] In the case at hand it was not a baton but a rifle butt to the head of Brad Proctor by WV State Trooper Hartley.[14]

What happened on the evening of January 18, 2018 was not a coordinated arrest plan involving multiple officers to capture a known violent offender. No. This was revenge plotted by Michael King because in part, he was embarrassed that he wrecked his cruiser during his pursuit of Brad Proctor eight days earlier. Additionally, I believe that another reason for King's viciousness is simply, this is who he has proven to be in numerous citizen complaints against him. The beating exacted by King and his accomplices; Stepp, McDonald, and Hartley was akin to a shark feeding frenzy. It was bloodlust.

---

[10] International Association of Chiefs of Police, *Police Use of Force in America,* 2001
[11] Criminal Justice: A Brief Introduction (7th Ed.) Schmalleger, F. (2008) p. 220
[12] Police Brutality- Definition, Examples, Cases and Processes, Legal Dictionary, Content Team, 2017
[13] Police Ethics: The Corruption of Noble Cause (2nd Ed.) Caldero, M.A and Crank, J.P (2004) p. 194
[14] Deposition of Brad Proctor, p. 105, ll. 9

---

In comparing the testimonies found in the depositions of both Deputy Michael King and Trooper Zachery Hartley against that of Brad Proctor on the details of January 18, 2018 could not be further apart.

According to the Report of Criminal Investigation by Trooper N.S. Stepp, he gave several verbal commands to stop which Proctor ignored.[15] Stepp, along with Trooper McDonald attempted to restrain Proctor by placing his hands behind is back. Deputy Michael King and Trooper Hartley arrived later and grabbed Proctor's legs as he was using them as a weapon against the subduing officers. After several minutes the officers were able to successfully place Proctor in handcuffs.[16]

Brad Proctor's account of these events immediately after the police entered his home contradicts that of the officers, such as: [17]

- Brad Proctor was already prone on the floor arms spread apart to 10 and 2 before the police entered
- Deputy King was first through the door, King believes that he was last
- Deputy King in a hurried pace shouted :"police" and then kicked Proctor in the face
- Proctor was handcuffed immediately, not after minutes of struggle with officers
- Proctor recalls at least four of five strikes, kicks or stomps by each of the four officers whereas none of the officers recall any such abuses
- Trooper Hartley struck Proctor at least three times in the back of his head with the butt of his assault rifle and Hartley denied assaulting Proctor in any manner and that he did not see Stepp or McDonald execute any face strikes to Proctor
- Not one of the three officers saw Deputy King do anything out of order during the arrest of Brad Proctor
- Brad Proctor states that he left face down in the snow outside his home for nearly an hour without most of his shirt (torn apart to the waist) stating it was torn during the assault whereas Deputy King states that while escorting Proctor outside to the cruiser, Proctor said he was going to vomit and that he voluntarily got on his knees briefly, then was escorted to the cruiser



Photograph of Brad Proctor taken January 18, 2018[18]

---

[15] Report of Criminal Investigation, Trooper N.S. Stepp, Detachment File # 433012870
[16] Ibid
[17] Compilation of discrepancies in testimony
[18] Processing photograph of Brad Proctor, obtained by WVNSTV©

I find it rather suspicious after looking at the photograph of Brad Proctor, taken shortly after he had the blood washed from his face that no one saw anything, heard anything or did anything that could have caused the injuries he sustained. This man was pummeled by malicious officers who have collectively denied any responsibility. Simply put, either one or all of the officers are lying about their participation in this attack.

Deputy Michael King made it abundantly clear that the warrant for Brad Proctor ". . . as a deputy, this was my warrant. So if we're getting into Mr. Proctor's, this was my warrant. It was actually my warrant."[19] When asked about matters of authority outside of Roane County, King indicated that he was a full time member of the U.S. Marshal Service "CUFF" Task Force, designed to arrest fugitives on federal warrants and "They don't take all felony warrants, just violent felony warrants, things like that, through the state."[20] This is the strategy used to justify Deputy King entering into an outside county and involving three U.S. Marshals who never entered the house during the arrest of Proctor.

Brad Proctor has never been accused of a violent felony, he is a thief, and not a particularly good one. Proctor admitted he was driving a stolen truck on January 10, 2018 and that he eluded Deputy King and the others who gave pursuit. Proctor has been caught stealing gas and poaching deer. He readily admits to his failures but he is not violent. He went to prison for his actions. The beating Brad Proctor sustained was both unethical and illegal. An investigation into the events of January 18, 2018 was either not done, or not done thoroughly.

Another point for consideration is the ratio of officers to offender. The arrest of a suspect, even an uncooperative and combative one, can reasonably be controlled by four officers without multiple injuries to either suspect or officers. In this matter, Proctor sustained broken ribs, extensive lacerations to the face and head requiring stiches or glue, loss of teeth, split tongue, bruising of the head and torso, and injuries to his hand, ankle and back. Still, not one of the four primary officers can explain how this happened?

As a retired elected Sheriff of six terms (24 years) and nearly 40 years of full-time law enforcement service, it pains me to state that this situation of abusive action by deputies and state troopers sits right at the feet of their command staff. This is the very definition of deliberate indifference. In a 1990 publication of the F.B.I. Law Enforcement Bulletin titled *Deliberate Indifference: The Standard for Municipal and Supervisory Liability* stated: "Federal appellate cases have also held that police managers are only liable in the case of constitutional violations resulting from deliberate indifference to the rights of others."[19] The article also cautioned ". . . to minimize their liability, police agencies should carefully review their training regarding high-risk activities such as the use of force."[21] According to Deputy King, the only training he has received in use of force was at the basic West Virginia State Police Academy over 15 years earlier.[22]

---

[19] Deposition of M.P. King, pp.28-29, ll. 24 – 2

[20] Ibid

[21] FBI Law Enforcement Bulletin, Volume: 59 Issue: 10 (October 1990) pp. 27- 32

[22] Ibid

[23] Deposition of M.P. King, pp. 25-26, ll. 24 - 1

**PROFESSIONAL OPINIONS:**

The opinions that I offer in this matter are based upon the totality of my years of full-time professional law enforcement experience, my formal education and extensive specialized training, my services as a criminal justice consultant and technical assistance provider and through relevant subject matter research. I have thoroughly reviewed all of the documents provided in this case as well as independent research of salient points in this case that reinforce my professional opinions in this regard. This report is preliminary in nature because there remains documents, official files, personnel records, training records and other material evidence to be obtained through the process of discovery. An addendum to this report may follow.

Defendants were negligent in the following respects:

1. The failure of the Defendants M.P. King, N.S. Stepp, S.A. McDonald and Z.W. Hartley to exercise restraint in the arrest of Brad Proctor and their use of excessive, wanton and brutal force against Bard Proctor was clearly unreasonable and therefore negligent;

2. The Defendant Roane County Commission has engaged in a pattern, practice or custom of failing to adequately investigate and take corrective actions for the conduct of their employees shows a deliberate indifference to a serious need and therefore negligent;

3. The Defendant Roane County Commission, by their acts and omissions has exhibited deliberate indifference to the unreasonable risk of unlawful deprivation of citizens' constitution rights, which its customs and policies are capricious, dated and consequently negligent;

4. The actions and/or omissions of Defendants M.P. King, N.S. Stepp, S.A. McDonald and Z.W. Hartley violated their duty to uphold the law and protect the public from illegal acts, showing a callous disregard for the wellbeing of citizens is clearly deliberate indifference and negligent;

5. The Defendant Roane County Commission's failure to act with regard to their knowledge of Defendant King's past failures to follow established law enforcement procedures and protocols relating to excessive force against third parties, as well as their negligent retention of Deputy King is deliberately indifferent and as such, negligent;

6. The Defendant Roane County Commission has failed to supervise, discipline, and/or train Defendant King after becoming aware of continued unlawful conduct is unreasonable and therefore negligent;

In conclusion, Defendants King, Stepp, McDonald and Hartley as well as the County of Roane, West Virginia have failed their constituents. Police are very limited in what they can do whereas the public has both a civil and criminal recourse to protect against police abuses like excessive force or police brutality. In today's society as the threats to the rule of law and civility grow worse, police leaders should be vigilant in framing policy, education, training and supervision that will equip their staff for the demands of public service. Ignoring these demands are reckless, indifferent and of course, negligent.

All opinions herein are rendered within a reasonable degree of certainty in the field of law enforcement operations and management.

_____

Gerry D. Billy

_____

Date